# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **PROGRESS RAIL SERVICES CORP.,** | ) |
| **Plaintiff,** | ) |
| v. | ) Civil Action No. _____ |
| **INDUSTRIAL AUTOMATION SPECIALISTS CORP.** | ) |
| **Defendant.** | ) |

## COMPLAINT FOR SPECIFIC PERFORMANCE AND DAMAGES

COMES NOW Progress Rail Services Corporation, which files its Complaint for Specific Performance, Breach of Contract, and Breach of Warranty and, in support thereof, alleges the following:

## PARTIES

1. Plaintiff is Progress Rail Services Corporation ("Progress Rail"), a corporation which is incorporated in the state of Alabama and which maintains its principal place of business in Alabama.

2. Defendant is Industrial Automation Specialists Corporation ("IAS"), a corporation which is incorporated in the state of Virginia and which maintains its principal place of business in Virginia.

## JURISDICTION

3. IAS is subject to the jurisdiction of this Court.  Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1332, because (1) there is complete diversity of citizenship among the parties and (2) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

1145148.7

## VENUE

4.     Venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the State of Alabama and within this District.

## BACKGROUND

5.     On January 26, 2011, Progress Rail and IAS entered into a contract designated "Purchase and Installation Agreement" (the "Agreement") in which IAS agreed to sell, design, manufacture, deliver, and install a large capacity railroad tie-handling robotic cell system ("System") at Progress Rail's Sherman, Texas facility.  The Agreement further obligated IAS to perform certain System installation services ("Services") necessary to ensure proper performance of the System.  The total contract price was $1,698,650.00.

6.     The Agreement required IAS to design and manufacture the System in accordance with detailed design specifications established in the Agreement and in the annexations thereto. Included in those specifications was the requirement that the System operate with a cycle time of 90 seconds (or less) to process a 10-foot tie with two standard tie plates and eight screws.

7.     The Agreement additionally required the delivery of a tie tag machine to be integrated with the System.

8.     IAS was required under the Agreement to deliver and install the System on or before November 31, 2011.

9.     In connection with the design, manufacture, delivery, and installation of the System, IAS was required under the Agreement to deliver certain documents that relate to the proper use and performance of the System.  These documents are designated by the Agreement as "Documentation."  Such Documentation was due upon final payment and was to include:

- Mechanical layout;
- Gripper and effector drawings;

- Hydraulic diagram with part numbers;
- Electrical diagram with part numbers;
- Software and ladder logic, commented and source code;
- Parameters including communication protocol and IP address list for each device;
- Lubrication and Preventative Maintenance for all items and areas (except for robots installed as part of the System); and
- Parts list for all hardware used.

10. Pursuant to the Agreement, IAS further promised to "supply detailed lubrication, adjustment and perishable part replacement schedules" and to "train [P]rogress [R]ail employees."

11. The Agreement contains a warranty clause, by which IAS agreed to warrant its performance under the Agreement for a period of one year for items designated as a "Deliverable" under the Agreement. The Deliverable items under the Agreement consist of the System and related Services, including the Documentation.

12. The warranty provided by IAS specifically includes post-contract "on-site troubleshooting and factory support from [IAS's] Houston, Texas and Hampton Virginia facilities in the event of System performance issues during the warranty period."

13. In exchange for IAS's performance under the Agreement, Progress Rail agreed to make payments totaling $1,698,650.00 in the following installments:

- $203,838.00 at project initiation;
- $475,622.00 at delivery of "Vision proof of concept" and "in-feed table and packman system" under the Agreement;
- $424,662.50 at delivery of "Remaining conveyers, robot rails and mounts, wood chip handling system";
- $254,797.50 at delivery of "Completed tie stacking system and carts, tie plate bins, spike handling system, tie plate etching system";
- $169,865.00 when "process is installed, started and runoff begins"; and
- $169,865.00 at the end of the Agreement, defined as thirty days from "successful run on 15 turnouts."

14.     As of the filing of this Complaint, Progress Rail has paid $1,673,650.00 of the overall $1,698,650.00 due.  Further, Progress Rail has expressly told IAS that it is willing and able to pay the final $25,000.00 owed under the Agreement.

15.     IAS has delivered and installed the System.  However, IAS refuses to provide the Documentation required under the Agreement, refuses to provide detailed lubrication, adjustment, and part replacement schedules, refuses to train Progress Rail employees, and refuses to provide post-contract on-site troubleshooting and factory support. Additionally, the System does not meet the contractually established design specifications.

16.     IAS further represented to Progress Rail that, to complete the design and manufacture of the System, IAS required an additional torque head.  Progress Rail purchased an additional torque head for approximately $30,000.00 and delivered it to IAS to complete the System.  The value of this torque head equals or exceeds the remaining $25,000.00 owed under the Agreement.  IAS has refused to return the torque head to Progress Rail.

17.     IAS communicated its refusal to complete its performance under the Agreement to Progress Rail by correspondence of July 17, 2013, wherein IAS stated that it would not perform its remaining contractual obligations without being paid additional consideration. Particularly, IAS told Progress Rail that, to obtain the Documentation, Progress Rail would need to agree to one of three options for remitting further payment to IAS: (1) a new contract providing for design and support services, at an unspecified cost; (2) a new contract providing for long-term support only (at a cost of $750,000); or (3) an hourly direct support contract at a rate of $170.00 per hour, plus expenses.  In addition to demanding the execution of a new contract for one of those three "options," IAS further demanded a new agreement for $124,500.00, which related to a series of proposed "upgrades" recommended by IAS.

18. IAS further specified in both email correspondence and a letter dated August 15, 2013 that the source code, which is required to be delivered to Progress Rail as an item of Documentation under the Agreement, would not be provided to Progress Rail unless Progress Rail entered into a new contract with IAS.

19. By email of July 24, 2013, Progress Rail told IAS that it was willing and able to pay the remaining $25,000 owed on the final payment under the Agreement, in exchange for IAS's completion of its contractual obligations. Specifically, Progress Rail said that it would pay $25,000 upon completion of the remaining items under the Agreement, and that upon such payment, it would expect the items of Documentation, including the source code, to be delivered as required by the Agreement.

20. On July 29, 2013, IAS refused to accept final payment and perform as required under the Agreement, and instead reasserted that it would require an additional payment before performing its remaining contractual obligations.

21. On account of IAS's failure to perform under the Agreement, Progress Rail has been unable to ensure or enjoy the proper performance of the System. Among other things, the lack of Documentation prevents Progress Rail from performing certain maintenance on the System, as well as certain mechanical and technological adjustments of the System.

22. Moreover, the System does not comply with the design specifications established by the Agreement. Those parameters required a cycle time of 90 seconds or less. The System, however, currently operates only at a cycle time of four minutes. In the absence of the Documentation or of any training by IAS, Progress Rail cannot adjust the System to attempt to remedy this defect.

23.     The System further does not comply with the design specifications established by the Agreement, because the tie tag machine IAS was required to manufacture and install as an integrated part of the System is not operational.  Accordingly, the System fails its intended purpose.

24.     In light of the inability to perform maintenance or otherwise operate the System pursuant to contractual parameters, which is caused solely by IAS's refusal to perform under the Agreement, Progress Rail cannot put the System into service and continues to suffer damage from the delay in its use.

25.     Delay damages are specifically awardable under the Agreement, which provides that time is of the essence.

26.     Due to IAS's numerous failures to timely perform its obligations under the Agreement, Progress Rail has suffered actual and economic damages, including, but not limited to: loss of profits; delay and downtime expenses and losses; diminished value to the System; future repair expenses due to the defects IAS has failed to timely remedy; and all other economic and financial damages.  Progress Rail's damages that are attributable to its delayed use of the System are significant and exceed $75,000.00.

27.     The value of the Documentation, for which Progress Rail seeks specific performance, exceeds $75,000.00, as the entire System, which cost $1,698,650.00 pursuant to the Agreement, cannot be properly used or adjusted absent IAS's production of the Documentation.

## **CAUSE OF ACTION I: SPECIFIC PERFORMANCE**

28.     Progress Rail re-alleges and incorporates paragraphs 1–27 herein.

29.     Progress Rail has paid all but $25,000 of the overall amount owed under the Agreement. Progress Rail has offered and demonstrated the capacity to pay the remaining amount.

30.     As further evidence of its present ability to pay the remaining amount due, Progress Rail (in conjunction with the filing of this Complaint) will file a Motion to Deposit Funds with the Court, by which Progress Rail will move the Court to allow $25,000 to be deposited into the registry of the Court.

31.     In light of Progress Rail's payment of $1,673,650.00 under the Agreement and offer to pay the final amount due thereunder, IAS is obligated to fulfill its duties to provide the Documentation required under the Agreement.  IAS's refusal to provide the Documentation to Progress Rail under the Agreement constitutes a repudiatory breach.

32.     Progress Rail is owed immediate specific performance of IAS's obligation to provide the Documentation.

33.     Progress Rail requests this Court grant judgment directing IAS to specifically perform its obligations to provide the Documentation under the Agreement and to return all other property owned by Progress Rail that is currently in IAS's possession, including, but not limited to, the additional torque head Progress Rail purchased and delivered to IAS to complete the design and manufacture of the System.

## CAUSE OF ACTION II: BREACH OF CONTRACT

34.     Progress Rail re-alleges and incorporates paragraph 1–33 herein.

35.     IAS's refusal to provide the Documentation to Progress Rail under the Agreement constitutes a repudiatory breach.

36.     IAS has further breached the Agreement by failing to deliver a System that fully complies with the contractual requirement of operation at a cycle time of 90 seconds or less and by failing to deliver an operational tie tag machine.

37.     On account of IAS's multiple breaches, Progress Rail has suffered significant damages resulting from the extended and ongoing delay in putting the System into service.  Such damages exceed $75,000.00.

38.     Progress Rail requests this Court enter an award in its favor of damages occasioned by IAS's breach of the Agreement.

## CAUSE OF ACTION III: BREACH OF WARRANTY

39.     Progress Rail re-alleges and incorporates paragraph 1–38 herein.

40.     IAS expressly warranted the performance of the System under the Agreement for a period of one year for items designated as a "Deliverable" under the Agreement.  The Deliverable items under the Agreement consist of the System and related Services.

41.     IAS expressly warranted that the System and related Services would (1) be free of defects in design, workmanship, and material; (2) comply with Progress Rail's requirements and specifications under the Agreement; and (3) be fit for Progress Rail's specific use and intended purpose.

42.     Despite being provided notice of the defects and given an opportunity to cure, IAS has not remedied the defects in the System.  IAS has breached its express warranty because the System does not comply with the design specifications established by the Agreement and is not fit for its intended use.

43.     By failing to provide a System that meets the express warranty, and failing to remedy known defects, the warranty has failed its essential purpose.

44.     The express warranty provided by IAS specifically includes post-contract "on-site troubleshooting and factory support from [IAS's] Houston, Texas and Hampton Virginia facilities in the event of System performance issues during the warranty period."

45. IAS has repudiatorily breached its warranty obligation by demanding additional compensation to perform post-contract troubleshooting and factory support.

46. As a result of IAS's breaches of express warranty, Progress rail has suffered financial loss and other damages.

## CAUSE OF ACTION IV: BREACH OF IMPLIED WARRANTY

47. Progress Rail re-alleges and incorporates paragraph 1–46 herein.

48. IAS impliedly assured that the System and Services it sold to Progress Rail were free from defects and were suitable to perform functions for which they were designed and manufactured. However, the System and Services IAS sold to Progress Rail were defective at the time they were delivered to Progress Rail and remain defective despite IAS having adequate time and opportunity to cure the defects.

49. The parties' Agreement, under which IAS contracted to sell, design, manufacture, and install the System, created an implied warranty of merchantability, which IAS breached by designing and selling to Progress Rail a System that is nonoperational and that fails to comport with the design specifications outlined under the Agreement.

50. The Agreement also gave rise to an implied warranty of fitness for a particular purpose. In particular, under the detailed design specifications outlined in the Agreement, IAS knew Progress Rail's particular purpose was to obtain a robotic tie-handling system that could operate at a cycle time of 90 seconds or less to process a 10-foot tie with two standard tie plates and eight screws. Progress Rail relied on IAS's ostensible design and engineering skills to manufacture a System that met these precise design specifications, and IAS had reason to know that Progress Rail was relying on IAS's skill and expertise. IAS breached this implied warranty by designing

and delivering a System that did not comply with the Agreement's design specifications, *i.e.*, with Progress Rail's particular purpose.

51.     IAS has breached the implied warranties of merchantability and fitness for a particular purpose.  IAS was notified of the defects in the System but failed to correct them.

52.     As a result of IAS's breach of these implies warranties, Progress rail has suffered financial loss and other damages.

WHEREFORE, Progress Rail respectfully requests this Court enter relief in the following particulars: specific performance of IAS's remaining contractual obligations; damages proximately caused by IAS's multiple breaches of contract, express warranty and implied warranty, in an amount to fully compensate Progress Rail for its actual and economic damages, including, but not limited to, loss of profits, delay and downtime expenses and losses, diminished value to the System, future repair expenses due to the defects that IAS has failed to remedy, and all other economic and financial damages allowed by law or equity; pre and post-judgment interest; reasonable attorneys' fees and costs incurred by Progress Rail in pursuing this litigation; and any and all other such general and equitable relief as this Court may deem appropriate.

DATED:  August 27, 2014

/s/ William L. Waudby
One of the Attorneys for Plaintiff,
Progress Rail Services Corp.

<u>Of Counsel</u>:

William L. Waudby
B<small>AKER</small>, D<small>ONELSON</small>, B<small>EARMAN</small>,
  C<small>ALDWELL</small> & B<small>ERKOWITZ</small>, PC
420 20th Street North, Suite 1400
Birmingham, AL  35203
Telephone:  (205) 244-3894
Facsimile:  (205) 488-3737
Attorney I.D. No.: xxx-xx-7879
bwaudby@bakerdonelson.com

## Certificate of Service

I hereby certify that I have served a copy of the foregoing document by Certified U.S. Mail on this the 27th day of August, 2014, and requested waiver of service pursuant to Fed. R. Civ. P. 4(d), to the following:

    Industrial Automation Specialists Corp.
    c/o Kathy M. Burton, Registered Agent
    17 Research Drive
    Hampton, VA  23666

                                                /s/ William L. Waudby
                                                Of Counsel